<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____

G.S. & S.S. o/b/o B.S.,                                   :

         Plaintiffs,                                   :        Civil Action No. 10-774 (FLW)

         v.                                   :

                                                  :        **OPINION**

CRANBURY TOWNSHIP BOARD OF
EDUCATION,                                   :

         Defendant.                                   :

_____

<u>**WOLFSON, United States District Judge:**</u>

    Presently before the Court are Cross- Motions for Summary Judgment by Plaintiffs G.S.

("Mr. G.S.") & S.S. ("Mrs. S.S.") (collectively referred to as "Plaintiffs" or "Parents"), on behalf

of their son B.S, a child classified as eligible for special services under the Individual with

Disabilities Act ("IDEA"), and by Defendant Cranbury Township Board of Education

("Defendant" or "Cranbury").  The instant motions arise out of Plaintiffs' appeal of a decision by

Administrative Law Judge ("ALJ") John R. Futey holding that Cranbury was able to provide B.S.

with a free and appropriate public education ("FAPE") at Princeton High School in accordance

with the IDEA and, therefore, that Cranbury was not required to reimburse Plaintiffs for tuition,

transportation and other costs associated with Plaintiffs' unilateral placement of B.S. at the Lewis

School, a private school located in Princeton, New Jersey.  This Court has jurisdiction pursuant

to 20 U.S.C. § 1415(i)(2)(A).  For the reasons set forth below, the Court affirms the ALJ's

decision and thus, denies Plaintiffs' Motion for Summary Judgment and grants Defendant's Motion.

## I. BACKGROUND

### A. Individuals With Disabilities Education Act, 20 U.S.C. 1400 et seq.

Through the IDEA, 20 U.S.C. §1400, et seq., the federal government provides funding to assist states in educating handicapped children living within their borders. Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176 (1982). Among the IDEA's purposes is "assuring that all handicapped children have available to them a free and appropriate public education which emphasizes special education and related services designed to meet their unique needs." L.P. v. Edison Bd. of Educ., 265 N.J. Super. 266, 272 (Law Div. 1993) (citing 20 U.S.C. §1400(c)). The IDEA realizes this aim by imposing a series of goals and procedures on participating states. See Bd. of Educ. of the Pawling Cent. Sch. Dist. v. Schutz, 290 F.3d 476, 481 (2d Cir. 2002); Edison Bd. of Educ., 265 N.J. Super. at 272-73 (describing requirements of 20 U.S.C. §§1412 and 1413). "In addition to establishing educational standards, the IDEA includes a 'mainstreaming' component requiring the placement of a student with disabilities in the least restrictive environment that will provide the child with a meaningful educational benefit." D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 556–57. (3d Cir. 2010) (citing L.E. v. Ramsey Bd. of Educ., 435 F.3d 384, 390 (3d Cir. 2006)).

Chief among a participating state's duties is that of creating an Individualized Education Plan ("IEP") for each disabled student within the state's school system. Susan N. v. Wilson Sch. Dist., 70 F.3d 751, 756 (3d. Cir. 1995); see Edison Bd. of Educ., 265 N.J. Super. at 272-73 (citing 20

2

U.S.C. §1414(d)).  In fact, "[t]he IEP is so significant that the courts have characterized it as the 'centerpiece' of the IDEA's system for delivering education to disabled children." Bayonne Bd. of Educ., 602 F.3d at 557 (citing Polk v. Cent. Susquehanna Intermediate Unit 16, 853 F.2d 171, 173 (3d Cir. 1988)).  In New Jersey, the duty to create an IEP can be assumed by a local educational agency ("LEA"), such as the District.  See N.J.S.A. 18A:46-5.1; Edison Bd. of Educ., 265 N.J. Super. at 273 (citing N.J.S.A. 18A:46-8).  The IEP is a written statement developed by a team comprised of the disabled student's parents, at least one of his or her teachers, and other local educational agency employees. 20 U.S.C. §1414(d)(1)(B).  It includes, among other things, a statement of the student's present educational performance, measurable annual and shorter-term goals, and the services to be provided to the child. 20 U.S.C. §1414(d)(1)(A).  An IEP team will review the IEP at least annually to determine whether the goals described in the Plan are being achieved. 20 U.S.C. § 1414(d)(4).

Specifically regarding the IEP, the Third Circuit has noted that it "must provide the student with a 'basic floor of opportunity,' [but] it need not necessarily provide the 'optimal level of services' that parents might desire for their child." Bayonne Bd. of Educ., 602 F.3d at 557 (citing Holmes v. Millcreek Twp. Sch. Dist., 205 F.3d 583, 590 (3d Cir. 2000)).  Therefore, "'the IEP must be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential.'"  Id. (citing Chambers v. Phila. Bd. of Educ., 587 F.3d 176, 182 (3d Cir. 2009).

The IDEA grants parents who disagree with the LEA's proposed IEP the right to challenge the IEP in a "due process" hearing via the state's administrative law process. Schutz, 290 F.3d at

481 (internal citations omitted) (citing Honig v. Doe, 484 U.S. 305, 311-12 (1988)); Edison Bd. of Educ., 265 N.J. Super. at 273-74.  In New Jersey, this process entails filing a complaint and request for a hearing with the New Jersey Department of Education. See generally Edison Bd. of Educ., 265 N.J. Super. at 273-74; N.J.A.C. 6A: 14-2.7(c).  New Jersey has further designated its Office of Administrative Law ("OAL") to hear the special education complaints filed with the Department. Edison Bd. of Educ., 265 N.J. Super. at 274.  The dispute is adjudicated by an ALJ, who has authority under the IDEA and New Jersey law to deem the LEA's proposed IEP inappropriate.  See id.; N.J.A.C. 6A: 14-2.7(n)-(o).  The ALJ's decision on "the appropriateness of the IEP is final and binding on the parties and must be implemented without undue delay."  Edison Bd. of Educ., 265 N.J. Super. at 274; N.J.A.C. 6A: 14-2.7(g).  Aggrieved parties may appeal the ALJ's decision to a state or federal district court. 20 U.S.C. §1415(i)(2).

Traditionally, the burden of proof to demonstrate compliance with the IDEA had been upon the school district. The parents needed only place the appropriateness of the IEP at issue, and the burden would then shift to the school district to prove that the IEP was indeed appropriate. In 2005, however, the Supreme Court changed the burden analysis.  See Schaffer v. Weast, 546 U.S. 49 (2005) ("burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief").  Following the Supreme Court's holding in Schaffer, the Third Circuit has held that "appellants bear the burden of proof when challenging the appropriateness of the relevant IEPs." Ramsey, 435 F.3d at 392 (citing Schaffer, 546 U.S. at 61). Subsequent to the Schaffer and Ramsey decisions, New Jersey enacted legislation placing the burden of demonstrating the appropriateness of an IEP upon the school district. N.J.S.A. 18A:46-

1.1. (2008); see also R.S. v. Somerville Bd. Of Educ., Civ. A. No. 10-4215, 2011 U.S. Dist. LEXIS 748, 2011 WL 32521, at *7 n.7 (D.N.J. Jan. 5, 2011).

In a situation where a child has been unilaterally placed by his or her parents in an educational setting contrary to the IEP, the parents may be entitled to reimbursement, only if the program proposed in the IEP was inappropriate "and if the parents demonstrate they have acted in good faith." Lascari v. Bd. of Educ., 116 N.J. 30, 50 (N.J. 1989); see also 20 U.S.C. §1412(a)(10)(C)(ii). The focus of the court's inquiry is to evaluate the appropriateness of "the IEP actually offered and not one that the school board could have provided if it had been so inclined." Lascari, 116 N.J. at 46.  Ultimately, the parents "are entitled to reimbursement only if a federal court concludes both that the public placement violated IDEA and that the private school placement was proper under the Act."  Florence County Sch. Dist. Four v. Carter by & Through Carter, 510 U.S. 7, 15 (1993) (emphasis added).

## B. FACTUAL BACKGROUND

B.S. is a fifteen-year-old student with disabilities who, at all relevant times, has been a resident of Cranbury, New Jersey, within the geographical area served by Defendant. Pl's Fact Statement ¶1; Def's Fact Statement  ¶ 1.   B.S. has a history of developmental delays and medical conditions that impact his educational performance, and has, at all times relevant, been eligible to receive special education and related services pursuant to the IDEA.  Pl's Fact Statement ¶1; Def's Fact Statement  ¶1; Administrative Record ("AR"), Plaintiffs' Exhibit 1, at 11; ALJ Decision, at 3.

B.S. has been classified as multiply disabled, with pervasive developmental disorder, attention deficit hyperactivity disorder, sensory integration difficulties, tendency towards preoccupation, and obsessive-compulsive tendencies.  AR, Plaintiffs' Exhibit 1, at 11; ALJ Decision, at 3.  B.S. is also physically short for his age, which causes him to have difficulty adjusting to his surroundings as well as with other students who are typically much larger in stature.  ALJ Decision, at 3.  Despite these issues, and as discussed at length below, B.S. has demonstrated considerable intellectual potential, particularly in the areas of math and science.

B.S. began attending second grade at the Cranbury School in September 2002.  B.S. had previously attended first grade in the Old Bridge Township Public School District. AR, Plaintiffs' Exhibit 1, at 10.  Prior to or upon his arrival in Cranbury, the Child Study Team ("CST") at Cranbury reviewed B.S.'s evaluations and IEP from Old Bridge, and accepted that B.S. was classified as "Eligible for Special Education and Related Services" under the category of Other Health Impaired since April 1, 2000. AR, Plaintiffs' Exhibit 1, at 10–11; ALJ Decision, at 3.

B.S. attended the Cranbury School from 2002 until his graduation from the eighth grade in 2009.  While at Cranbury, B.S. received some classes in the general education setting and other classes in the resource classroom.  Specifically, and in relevant part, as an eighth grade student, B.S. received replacement English, replacement Social Studies, Algebra I in the general education setting, Science with in-class support, French as a world language, Speech as a related service, Physical Therapy, and Adaptive Physical Education.  Def's Fact Statement ¶ 3.  B.S. benefitted from various modifications and accommodations while a student at Cranbury.  For

example, in eighth grade English, B.S. benefitted from the use of guided notes, study guides, graphic organizers, visual cues, redirection to task, chunking for long-term assignments and extra time on assignments.  Def's Fact Statement ¶ 10.  As a result, B.S. received grades of 87 and 92 in English for the first and mid-term second quarter.  Id. ¶ 9.  In Math, B.S. benefitted from preferential seating, shortened assignments, wait time for auditory questioning and an extra set of textbooks.  Id. ¶ 12.  B.S. received grades of 92 and 90 for the first and mid-term second quarters in Algebra 1.  Id. ¶ 11.  In Science, B.S. benefitted from, inter alia, preferential seating, extra time, alternate assessments, study guides, extra books, and received grades of 93 and 87 for the first and second mid-term second quarters.  Id. ¶¶ 13, 14.  B.S. benefitted from similar accommodations in Social Studies and received a 95 and 96 for the first and second mid-term second quarters; in French B.S. received a grade of 99 for the mid-second quarter.  Id. ¶¶ 15-18.

In light of B.S.'s impending eighth grade graduation in June 2009, the CST began to consider high school placements for B.S. as early as 2008, when he was in the seventh grade. AR, Plaintiffs' Exhibit 7; Hearing Transcript 1, at 80.  The CST considered various options for B.S. including New Hope Academy, the Newgrange School, and the Bridge Academy.  In addition, at the Parents' request, the CST considered and visited the Lewis School.  Id. at 81-82.  B.S.'s parents, however, expressed concerns about all the potential placements except the Lewis School. For example, Mr. and Mrs. S. were concerned about Bridge Academy, noting that the facilities were not "conducive to learning especially for a distractible child," and also felt that Bridge Academy would not properly challenge B.S. AR, Plaintiffs' Exhibit 7.  Mr. G.S. also expressed concern about security at the Newgrange School.  Id.  In addition, Ms. Atzrott testified that the

facility at New Hope Academy "presented a problem" for the Parents.  Hearing Transcript 1, at 81-82.

Importantly, throughout the entire selection process beginning well before the issuance of the IEP, the Parents appeared to only express an interest in placing B.S. at the Lewis School after his graduation from Cranbury.  See, e.g., Hearing Transcript 1 at 81; ALJ decision at 23.  Indeed, on or around January 9, 2009, prior to meeting with Cranbury regarding B.S.'s IEP, and unbeknownst to Cranbury, the Parents signed a contract to place B.S. at the Lewis School for the summer of 2009 and the 2009-2010 school year. ALJ Decision, at 20; Hearing Transcript 5, at 142, 164.  Although the Parents aver that they signed a contract with the Lewis School merely to reserve a spot for B.S. and, moreover, that the contract would permit Plaintiffs to withdraw B.S. from the Lewis School, in the underlying decision, the ALJ found that the fact that the Parents had entered a contract with the Lewis School prior to the IEP meeting and, more importantly, that they had not disclosed that fact to Cranbury, demonstrated the Parents' lack of good faith "in attempting to pursue an appropriate placement for B.S."  ALJ Decision at 23.  Indeed, the ALJ rejected the Parents' contention that they only signed the contract to reserve a spot for G.S. and noted that the Parents' failure to tell Cranbury about the contract,

> supports the conclusion that the family had already made up its mind about its placement preference and determination by that time even though they had lulled the Cranbury child study team into believing that they were still willing to work together in good faith in attempting to provide the appropriate program and placement for B.S. . . .I fail to understand what other resolution(s) would have worked for or satisfied the parents since it was made abundantly clear . . . that the only placement theat they wanted for their child is Lewis, notwithstanding any positive efforts by Cranbury to the contrary, including but not limited to having two of their professional staff continue to investigate alternative placements including site inspections, even well after the unilateral and undisclosed decision

by petitioners in January to lock in the Lewis placement.
Id.

Importantly, however, the Cranbury CST did not view the Lewis School as a viable option for B.S. Indeed, B.S. attended the Lewis School for an Extended School Year ("ESY") program in 2008, and several of his teachers reported that it was a "rough" transition for B.S. when he returned to Cranbury. ALJ Decision, at 13. Isabelle Perry ("Ms. Perry"), the CST Coordinator, indicated that B.S.'s teachers collectively stated that B.S. struggled more than usual in returning to a routine following the time spent at the Lewis School. Hearing Transcript 5, at 151. Ms. Perry also indicated that after B.S. attended the summer program in 2008, the Lewis School never provided a report to document B.S.'s progress while at the Lewis School, even after Ms. Perry requested such a report. Hearing Transcript 4, at 48; ALJ Decision, at 12.

After consideration of numerous placements, including site visits, in or around January 2009, Cranbury proposed to transition B.S. into the mainstream Princeton High School ("PHS") in Princeton, New Jersey, beginning in September 2009. AR, Defendant's Ex. 10 at 22; ALJ Decision at 3. B.S.'s parents, however, expressed various concerns about placing B.S. at PHS including, inter alia: (1) the transition to high school from grade school; (2) B.S's ability to navigate the halls, stairs, doors, and lockers; (3) physical education accommodations, since he had never changed for gym class while a student at Cranbury; and (4) the ability to continue to work on B.S.'s social skills . AR, Defendant's Exhibit 9, at 2; ALJ Decision, at 5. In an attempt to address the parents' concerns, Ms. Atzrott and Ms. Perry visited Princeton High School and were given a "mock schedule," where they sat in on an in-class resource U.S. History class, an in-class resource science class, and a replacement English class – all of which were ninth grade

9

classes. Hearing Transcript 1, at 66; see also ALJ Decision, at 5.  Following their visit to PHS,

Ms. Atzrott noted that the school's hallways were less crowded during transition times than at

Cranbury, and that even though she did not foresee any problems with B.S. navigating the

stairways in the two-story building, an elevator was available should B.S. ever struggle with

stairs. Hearing Transcript 1, at 67–70.  Ms. Atzrott also stated that she could not find any

disadvantage to B.S. attending Princeton High School; rather, she believed that it would be

beneficial for B.S. to attend PHS, where he would move up with his peers from Cranbury, with

whom he had been classmates since the second grade, and who had "nurtured" him throughout

that time. Hearing Transcript 1, at 72; ALJ Decision, at 5.

On January 14, 2009, an eligibility conference was conducted regarding B.S., and,

subsequently, on January 29, 2009, an IEP High School Annual Review meeting was conducted

with members of the Cranbury CST, B.S.'s parents and a member of the Princeton Child Study

Team.  The IEP recommended placement at Princeton High School where B.S. would receive

replacement English in 2009-2010 by a special education teacher, but where he would receive the

New Jersey Core Curriculum in all other areas.   Def's Fact Statement at 23, Def's Ex. 10.

Moreover, the IEP assessed and addressed B.S.'s academic achievements in the subjects of

English, Math, Science, Social Studies, World Languages, and Special Area Classes such as

Physical Education, Art, and Health. AR, Defendant's Exhibit 10; ALJ Decision, at 4.  For

example, due to B.S.'s difficulty with organizational skills, reading fluency, critical thinking,

written expression, and oral communication, the IEP recommended that B.S. be placed in a

replacement English course, which would provide him with a smaller group setting. Id.  In

addition, the IEP also recommended placing B.S. in the following courses: (1) a mainstream setting for Geometry I with use of modifications/accommodations; (2) science instruction in a co-teaching inclusive setting with the use of modifications/accommodations for Biology I with an additional Biology Lab; (3) US History I in an inclusive setting with the support of a special education teacher and a US History support lab; (4) a mainstream setting for French II with use of modifications and/or accommodations; (5) and all special area classes, i.e., PE, Art, Health, Computer etc., in a mainstream classroom with modifications or accommodations as needed. Def's Ex. 10.

The IEP additionally reflected B.S.'s continued need for speech language intervention.  See ALJ Decision, at 4; AR, Defendant's Exhibit 10, at 10.  Indeed, the IEP provided, "[B.S.] demonstrates continued needs in the area of communication," and therefore, "development of his oral language and social communication skills should remain an integral part of his special education program at the high school level." AR, Defendant's Exhibit 10, at 10.  More specifically, the IEP called for in-class speech language services in the context of his replacement English class, as well as continued participation in a social skills group on a pull-out basis. Id. The IEP also provided for an aide at Princeton, who would "assist [B.S.] with transition periods, organizational skills and to facilitate social interactions with peers." Id. at 20. The IEP concludes with a "Statement of Annual Goals and Objectives" for B.S. Id. at 25–27.

In addition, while the Extended School Year ("ESY") for the Summer of 2010 was not discussed at the IEP meeting, in an email communication dated March 30, 2009, Plaintiffs confirmed their understanding that an ESY would be provided to B.S. Def's Fact Statement at

56.  In fact, the Court notes that while an ESY program was added to the IEP at a later date through an addendum, the addendum did not identify the specific location for the ESY program and simply provided that "[a] summer program will be offered for [B.S.] in order to maintain his social skills, structure and routine." AR, Defendant's Exhibit 7.  According to Defendant, the addendum did not specify a location for the ESY since, at that time, Cranbury was still investigating options other than PHS and the District intended B.S.'s ESY placement to be the same as his school year placement.  Def's Fact Statement 56,57.  As a result, Cranbury withheld any decision regarding B.S.'s specific ESY placement until his high school placement was finalized. Hearing Transcript 3, at 19; ALJ Decision, at 6.

At some point after meeting with Cranbury and receiving a copy of the IEP, the Parents filed a request for a Due Process hearing.[1]  On March 9, 2009, Margaret J. Kay, Ed. D. ("Dr. Kay"), performed testing on B.S. at the request of B.S.'s parents and prepared an independent educational evaluation ("IEE") for them.  Id. at 9, 14.  At the time of the testing, B.S. was 13 years and 8 months old.  The testing took place at Dr. Kay's office in Lancaster, Pennsylvania and lasted approximately four hours. Hearing Transcript 5, at 46; ALJ Decision, at 16.  Dr. Kay's report indicated that she administered a number of tests[2] and concluded that B.S. "is a seriously

---

[1] The Court notes that none of the documents filed in this matter contain a proper procedural history setting forth various relevant dates including, for example, the date the Parents filed for a Due Process hearing.  Thus, although the Court will attempt to recreate the relevant history to the best of its ability, the Court is not clear whether the Parents filed for a Due Process hearing before or after they engaged Dr. Kay to perform independent testing on B.S. or at what point during their discussions with Cranbury.

[2] The numerous tests included the Wechsler Intelligence Scale for Children-IV; Test of Silent Word Reading fluency Form A; Developmental Test of Visual-Motor Integration; Rapid Automatized Naming & Stimulus Test; Wechsler Individual Achievement Test-II; Bender Motor Gestalt Test; Test of Pragmatic Language; and Lateral Dominance Examination. AR,

*multi-handicapped*" child who demonstrates symptoms of "Pervasive Developmental Disorder-Not Otherwise Specified []; Attention Deficit Hyperactivity Disorder/primarily Inattentive subtype; specific learning disabilities in reading comprehension, reading fluency, written expression and oral expression; speech/language impairments with deficits in pragmatic language and rapid naming speed; and fine- and gross-motor deficits." AR, Defendant's Ex. 8.  As a result of his disabilities, Dr. Kay recommended specially designed instruction to help B.S. improve pragmatic and social language skills, comprehension, and written expression.  Id.  More specifically, Dr. Kay recommended certain accommodations including: a predictable schedule; small, structured classes; organization skills monitored on a daily basis; extended time to complete assignments; oral tests in lieu of written examinations; and frequent breaks from reading and writing activities. Id.

In May 2009, a mediation session was held between the parties. ALJ Decision, at 9. When presented with Dr. Kay's report at the May mediation, the CST reviewed the recommendations, but did not incorporate them into the IEP.   Importantly, B.S.'s parents never asked the CST to incorporate Dr. Kay's findings into the IEP at issue, Hearing Transcript 3, at 98, however, upon review, Ms. Perry noted that many of Dr. Kay's recommendations and concerns were already reflected in the IEP. Hearing Transcript 3, at 102  For example, Dr. Kay recommended various modifications or accommodations to enable B.S. to "maximize his ability to be educated with children who are not disabled" including: extra time on assignments, additional notes and study

---

Defendant's Exhibit 8. There were also numerous questionnaires completed: Gilliam Autism Rating Scale-2; Asperger's Syndrome Diagnostic Scale; Behavior Assessment System for Children-r; Parent Input Questionnaire; Gilliam Asperger's Disorder Scale; Adaptive Behavior Assessment System-II; Clinical Assessment of Attention Deficit-Child; and a Teacher Input Questionnaire. AR, Defendant's Ex. 8.

guides and shortened assignments. AR, Def's Exhibit 8.  Notably, these recommendations and

modifications were similar to those provided to B.S. at Cranbury and those that, according to the

IEP, would be continued at PHS.  AR, Def's Exhibit 10.

Ultimately, the May mediation was unsuccessful and, on June 28, 2009, the Office of Special

Education Programs transmitted the matter to the Office of Administrative Law for final

determination.  ALJ Decision at 1.  The initial day of the hearing was set for July 1, 2009,

however, at the request of the parties, the first day of the hearing was converted into a pre-

hearing conference.  Thereafter, five days of evidentiary hearings were held between August 12,

2009 and October 21, 2009.  ALJ Decision, at 2.

During the hearings it became apparent that there were numerous areas of disagreement

concerning B.S. between the CST and Dr. Kay.  For example, the parties disagreed regarding

appropriate class size for B.S.; specifically, Ms. Perry stated that based on B.S.'s success in a

mainstream eighth grade advanced math class with 22-23 students (in which B.S. was provided

with accommodations and modifications but no teaching assistant or in class special education

teacher), mainstream classes at PHS with approximately 25 students would similarly be

appropriate.  Hearing Transcript 3, at 102 -103; ALJ Decision at 10.  Ms. Perry also indicated

that B.S. had succeeded in a mainstream eighth grade science class, where he was provided with

a teaching assistant.  Hearing Transcript 3, at 103; ALJ Decision, at 10.  In contrast, Dr. Kay

stated that smaller, structured classes would be appropriate for B.S.  Hearing Transcript 5, at 87;

AR, Defendant's Exhibit 8.  However, Dr. Kay did not indicate whether she ever completed a

functional assessment that would lead to such a conclusion. Id.[3]

In addition, Ms. Perry testified that some of Dr. Kay's recommendations for B.S. seemed too "immature," such as the suggestion that B.S. participate in the Drop Everything and Read ("DEAR") program.  Hearing Transcript 5, at 147; ALJ Decision, at 21.  Indeed, B.S. had been successful in many mainstream courses while a student at Cranbury, and his teachers, Ms. Lundquist and Ms. Penney, both noted B.S.'s need for cognitive challenges, which was consistent with the programming to be provided to him at Princeton High School.  Id. However, Dr. Kay testified that she did not believe B.S. was ready to attend high school, and that PHS would not be appropriate.  Hearing Transcript 5, at 36.

Conversely, Dr. Kay recommended that B.S. be placed at the Lewis School, noting the smaller class sizes, and that B.S. could likely navigate the hallways independently, without an aide. Hearing Transcript 5, at 42; ALJ Decision, at 16.  That said, Dr. Kay also testified that while she had recommended the Lewis School in the past, she had not visited the school for approximately twelve years. Hearing Transcript 5, at 52-54.  Indeed, Dr. Kay could not remember the number of floors at the Lewis School, whether the school had  an elevator, the number of buildings on the campus, or any other particulars about the Lewis School; moreover, Dr. Kay also admitted that she did not conduct a mobility assessment on B.S.  Id.

Finally, Dr. Kay testified that Cranbury's IEP did not sufficiently identify ways to close the skill gaps in B.S.'s deficient areas by, for example, detailing specially designed instruction for

---

[3]Indeed, not only did Dr. Kay not perform certain tests, but, Ms. Perry questioned the testing that Dr. Kay did perform on B.S. since it was conducted in a single four-hour session and Dr. Kay never inquired into B.S.'s fatigue despite the fact that his parents drove him from New Jersey to Lancaster, Pennsylvania for the test on that same day.  Hearing Transcript 5 at 46-47.

B.S. Hearing Transcript 5, at 32, 34.  However, Dr. Kay also testified that she was satisfied with the accommodations incorporated into B.S.'s IEP and acknowledged that if her additional recommendations were included, then the IEP would otherwise be satisfactory. Hearing Transcript 5, at 66–68; ALJ Decision, at 17.

On or around July 2, 2009, during the pendency of the evidentiary hearings, B.S.'s parents advised Cranbury in writing that if the matter regarding B.S.'s high school placement was not resolved within 10 days, B.S. would be unilaterally placed in the Lewis School for the 2009-2010 school year.  Pl's Exhibit 12.  On August 4, 2009, the Parents sent an email to Cranbury[4] advising their decision "to unilaterally place [B.S.] in the Lewis School . . . because we think the Princeton High School ("PHS") placement . . . is not appropriate."  Affidavit of G.S. in Support of Motion for Summary Judgment, Exhibit B.

Ultimately, the Parents placed B.S. in the Lewis School for the 2009-2010 school year. Specifically, and in relevant part, Mr. G.S. testified that B.S.'s difficulties in English and History made it clear that he was simply not ready for a mainstream high school environment.  Hearing Transcript 5, at 105.  In addition, Mr. G.S. testified that the Lewis School would be a better fit for B.S. because of its' smaller class sizes, the amount of full-time speech language pathologists (three of four), daily grapho-motor written exercises, the smaller physical space of the school, and the fact that B.S. would not need an aide at that school.  Hearing Transcript 5, at 107-110; ALJ Decision, at 18-20.

**II. STANDARD OF REVIEW**

---

[4]The Court notes that the email was addressed to a Mr. Haney, however, neither party has identified who this person is nor what his role was in determining the placement for B.S.

Although framed as a motion for summary judgment, the instant matter is actually an appeal of the ALJ's ruling. Indeed, "[w]here no new evidence has been presented to the Court, motions for summary judgment in an IDEA case are the procedural vehicle for asking the judge to decide the case based on the administrative record." K.H. o/b/o K.H. v. N. Hunterdon-Voorhees Reg'l High Sch. Hunterdon Co., No. 05-4925, 2006 U.S. Dist. LEXIS 55522, *11 (D.N.J. Aug. 10, 2006) (citing M.A. v. Voorhees Twp. Bd. of Educ., 202 F. Supp. 2d 345, 359 (D.N.J. 2002)). The standard of review in an IDEA case "differs from that governing the typical review of summary judgment." Voorhees Twp., 202 F. Supp. at 359 (quoting Heather S. by Kathy S. v. State of Wisconsin, 125 F.3d 1045, 1052 (7th Cir. 1997), aff'd, 65 Fed. Appx. 404 (3d Cir. 2003)). In an IDEA case, a court exercises a "modified version of de novo review" over an administrative decision. Ramsey, 435 F.3d 384, 389. Under this standard, a court gives "due weight" to the determinations of the administrative law judge. Rowley, 458 U.S. at 206 (1982). The purpose of the "due weight" standard is to prevent the courts from imposing their own "view of preferable educational methods on the states." Id. However, a court is not required to accept the findings of the administrative law judge, Carlisle Area Sch. v. Scott P. By and Through Bess P., 62 F.3d 520, 529 (3d Cir.1995), as long as a reviewing court "fully explain[s] its reasons for departing from the state decision," S.H. v. State-Operated Sch. Dist. of City of Newark, 336 F.3d 260, 271 (3d Cir. 2003).

"'[F]actual findings from the administrative proceedings are to be considered prima facie correct,' and if the reviewing court does not adhere to those findings, it is 'obliged to explain why.'" Bayonne Bd. of Educ., 602 F.3d at 564 (citing P.P. v. West Chester Area Sch. Dist., 585 F.3d 727, 734 (3d Cir. 2009). In particular, where "an ALJ has heard live testimony and

determined that one witness is more credible than another witness, her determination is due special weight."  Id. (citing Shore Reg'l High Sch. Bd. of Educ. v. P.S., 381 F.3d 194, 199 (3d Cir. 2004)).  "Specifically, this means that a District Court must accept the state agency's credibility determinations 'unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion.'"  Id. (citing Shore Reg'l High, 381 F.3d at 199 (quoting Carlisle Area Sch., 62 F.3d at 529) (emphasis in original)). "[T]he word 'justify' requires that the applicable standard of review be essentially the same as that a federal appellate court applies when reviewing a trial court's findings of fact."  Id. (citing Shore Reg'l High, 381 F.3d at 199).

"The issue of whether an IEP is appropriate is a question of fact." State-Operated Sch. Dist. of Newark, 336 F.3d at 271 (citing Carlisle Area Sch., 62 F.3d at 526). "A federal district court reviewing the administrative fact finder in the first instance is . . . required to defer to the ALJ's factual findings unless it can point to contrary nontestimonial extrinsic evidence on the record." G.N. v. Bd. of Educ. of Livingston, Civ No. 05-3325, 2007 U.S. Dist. LEXIS 57081 at *15 (D.N.J. Aug. 6, 2007) (quoting State Operated Sch. Dist. of Newark, 336 F.3d at 270). Therefore, the Court treats the ALJ's findings on the IEPs' appropriateness as prima facie correct, Bayonne Bd. of Educ., 602 F.3d at 564, and reviews them under a clearly erroneous standard, Carlisle Area Sch., 62 F.3d at 526 (citing Hassine v. Jeffes, 846 F.2d 169, 174 (3d Cir. 1988)).  However, the Court's review over questions of law and the ALJ's application of legal precepts is plenary. Carlisle Area Sch., 62 F.3d at 528, n.3; D.B. v. Ocean Twp. Bd. of Educ., 985 F. Supp. 457, 500 (D.N.J. 1997); Bucks Cty. Dept. of Mental Health/Mental Retardation v. De Mora, 227

F. Supp.2d 426, 428 (E.D. Pa. 2002). <u>See also</u> <u>Spectator Mgmt. Grp. v. N.L.R.B.</u>, 320 F.3d 385, 390 (3d Cir. 2003); <u>Fotta v. Trs. of the UMW Health & Ret. Fund of 1974</u>, 319 F.3d 612, 615-16 (3d Cir. 2003).

## III. DISCUSSION

The instant appeal requires this Court to review the ALJ's decision finding that the IEP provided by Cranbury was in accordance with the IDEA in that Cranbury was able to provide B.S. with a FAPE at Princeton High School for the summer of 2009 and the 2009-2010 school year. "When parents challenge [the adequacy of] a school's provision of a [free and appropriate public education] to a child, a reviewing court must (1) consider whether the school district complied with the IDEA's procedural requirements and (2) determine whether the educational program was 'reasonably calculated to enable the child to receive educational benefits.'" <u>Mary Courtney T. v Sch. Dist.</u>, 575 F.3d 235, 249 (3d Cir. 2009) (quoting <u>Rowley</u>, 458 U.S. at 207).

### 1. Whether Cranbury Complied with the IDEA's Procedural Requirements:

First, the parents argue that Cranbury failed to comply with the IDEA's procedural requirements because: (1) the placement offered by Defendant did not contain the recommendations of Plaintiffs' expert, Dr. Kay, concerning B.S.'s need for specially designed instruction and because it failed to provide an ESY; and (2) that Defendants failed to respond to written requests dated July 2, 2009 and August 4, 2009, and that such a failure violated N.J.A.C. § 6A:14-2.3(h)(5) which requires a school to respond to written requests within 20 days. The Court does not agree.

Initially, the Court notes that based on a review of the Administrative Record, it does not appear that Plaintiffs raised these alleged procedural violations before the ALJ; indeed, these issues appear to be raised for the first time on appeal to this Court.  Pursuant to the IDEA, the failure to raise an issue at the administrative level will result in a waiver of the issue on appeal to a district court.  Woods on Behalf of T.W. v. New Jersey Dept. of Educ., 796 F. Supp. 767, 775 (D.N.J. 1992)(citing David D. v. Dartmouth School Committee, 775 F.2d 411, 424 (1st Cir.1985); Field v. Haddonfield Board of Education, 769 F.Supp. 1313, 1325 (D.N.J.1991); see also Carey on Behalf of Carey v. Maine School Administrative District, 754 F. Supp. 906 (D. Me.1990)).  However, even if these issues had been properly raised before the ALJ, the Court finds the alleged procedural violations are without merit.

The procedural requirements of the IDEA are essential to the fulfillment of its purposes. The Supreme Court has noted that it is "no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process . . . as it did upon the measurement of the resulting IEP against a substantive standard." Rowley, 458 U.S. at 205-206, 102 S.Ct. 3034. The IDEA sets forth procedural requirements, 20 U.S.C. § 1415, which have been further delineated in federal and state regulations promulgated thereunder, 34 C.F.R. § 300.500, N.J.A.C. § 6A:14-2. Under New Jersey state regulations implementing the IDEA, procedural violations may lead to a finding that a student did not receive a FAPE if the violations "(1) impeded the child's right to a FAPE; (2) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of FAPE to the child; or (3)

caused a deprivation of educational benefits."  N.J.A.C. § 6A:14-2.7.  See also G.N. ex rel. J.N. v. Bd. of Educ., 309 Fed.Appx. 542, 545-546 (3d Cir.2009).  Procedures used to develop an IEP must be strictly reviewed, although "technical deviations do not render an IEP invalid."  Dong ex rel. Dong v. Board of Educ., 197 F.3d 793, 800 (6th Cir.1999).

Initially, the Court finds that Plaintiffs' contention that the IEP failed to comply with procedural requirements because it did not contain certain recommendations of the parents' expert and that it failed to provide an ESY does not, in fact, implicate a procedural issue.  It is well-established that "[t]he content of an IEP . . . does not implicate the IDEA's procedural requirements for content is concerned with the IEP's substance, i.e., whether the IEP 'reasonably [is] calculated to enable the child to receive educational benefits.'"  D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 565 (3d Cir. 2010).  Because the Parents' first concern is inherently substantive and not procedural, the Court will not consider this issue at this juncture.

In addition, while the parties' second argument does present a procedural question, the Court finds that Defendant's alleged failure to respond to letters dated July 2, 2009 and August 4, 2009 letter is not actionable.  Indeed, while Plaintiffs are correct that New Jersey regulations require school districts to respond in writing within 20 days, N.J.A.C. § 6A:14-2.3(h)(5), procedural violations are actionable under the IDEA only if the violation results in a loss of educational opportunity for the student, seriously deprives parents of their participation rights, or causes a deprivation of educational benefits.  D.S. v. Bayonne Bd. of Educ., 602 F.3d at 565 (citing Winkelman v. Parma City Sch. Dist., 550 U.S. 516, 525-26 (2007); J.L. v. Mercer Island Sch. Dist., 592 F.3d 938, 953 (9th Cir.2010)).   Here, Defendant's failure to respond to the July 2,

21

2009 and August 4, 2009 letters does not demonstrate a procedural violation.  Indeed, Plaintiffs

sent the July 2, 2009 letter to Cranbury to provide notice that if the parties are "unable to resolve

this matter amicably over the next ten (10) business days . . . the parents shall be unilaterally

placing [B.S.] in the Lewis School . . . for the 2009-2010 school year."  Pl's Ex. 12.  Thus, while

Cranbury's unresponsiveness may have been frustrating for Plaintiffs, the Parents were present at

the January 2009 IEP meeting and held continued discussions with Cranbury throughout March

and April, and again at the mediation in May.  Similarly, the August 4, 2009 letter was drafted

approximately a week prior to the commencement of the due process hearing between the parties.

Thus, while the Parents disagreed with the IEP's placement of B.S. at PHS, and contend that B.S.

was deprived of educational benefits as a result of Cranbury's failure to respond to the letter, in

light of the continued meetings, discussions and mediation concerning B.S.'s placement, the

Court finds that the Parents had the opportunity to participate meaningfully in the creation of an

IEP for B.S. and any alleged "deprivation cannot reasonably be traced to [Cranbury's] delay in

responding to [Plaintiffs'] letter[]."  D.S. v. Bayonne Bd. of Educ., 602 F.3d at 566.   For these

reasons, the Court finds that Plaintiffs have not demonstrated that Cranbury failed to comply with

the procedural requirements of the IDEA.

### 2. Whether the Educational Program was 'Reasonably Calculated' to Enable B.S. to Receive Educational Benefits

In addition to considering any alleged procedural violations, a court reviewing a challenge to

the adequacy of a school's provision of a FAPE must "determine whether the educational

program was 'reasonably calculated to enable the child to receive educational benefits.'" Mary

Courtney T. v Sch. Dist., 575 F.3d 235, 249 (3d Cir. 2009) (quoting Rowley, 458 U.S. at 207).

Importantly, the IDEA does not require a school district to provide the best possible education for a child with a disability, merely an appropriate education. Rowley, 458 U.S. at 189; Polk, 853 F.2d at 178 (discussing Rowley, 458 U.S. at 189). To be appropriate under the IDEA, an IEP must provide "'meaningful' access to education and confer 'some educational benefit' upon the child for whom it is designed." Ridgewood Bd. of Educ. v. P.S., 172 F.3d 238, 247 (3d Cir. 1999) (quoting Rowley, 458 U.S. at 192, 200). However, the Third Circuit has held that the educational benefit must be more than "trivial," and must offer the potential for "significant learning" and "meaningful benefit." Id.; see also Shore Reg'l High, 381 F.3d at 199 (appropriate IEPs must be "'reasonably calculated' to enable the child to receive 'meaningful educational benefits' in light of the child's 'intellectual potential'").

As discussed above, a federal court reviewing the appropriateness of an IEP is required to defer to the factual findings of an ALJ, G.N., 2007 U.S. Dist. LEXIS 57081 at *15, and reviews the factual findings under a clearly erroneous standard. Carlisle Area Sch., 62 F.3d at 526 (citing Hassine v. Jeffes, 846 F.2d 169, 174 (3d Cir. 1988)). In the underlying decision, the ALJ found that Princeton High School was an appropriate placement for B.S. and, therefore, that Cranbury's IEP satisfied the requirements of the IDEA. Specifically, the ALJ found that:

> the proposed IEP sets forth specific goals and objectives and identifies various, personalized accommodations in order to provide for the needs of B.S. and reflects a high degree of sensitivity to his needs and an awareness of his strengths and weaknesses. In the process, the determination to place him at Princeton High School represents a comprehensive collaboration between both the sending district and the receiving district as B.S. was positioned to transition out of the eighth grade.

ALJ Decision at 27.

In their appeal, however, the Parents argue that Defendant failed to prove that the placement at Princeton High School, as offered in its IEP, was appropriate for B.S.'s unique needs because: (1) B.S. was not ready to transition into the mainstream high school; (2) the 2009 – 2010 IEP does not include special instruction individually designed for B.S.; (3) the IEP is not based on peer-reviewed research; (4) the IEP recommends a one-to-one aide; (5) Princeton High School has numerous "areas of need" regarding its ability to provide a FAPE; and (6) Defendant failed to provide an ESY for the 2009 summer. The Court does not agree.

Initially, the Parents argue that Cranbury's IEP placing B.S. at PHS, a mainstream high school, was inappropriate because B.S. functions "as a much younger child in a number of critical social, academic and vocational areas." Pl's Br. at 23.   In support of this argument, Plaintiffs rely on testimony from Isabelle Perry, the CST Coordinator, that B.S. functions as a younger child "in terms of independence, reaction to situations, handling disappointments, personal perspective and experience and interactions with peers." Id.  In addition, the parents rely on Dr. Kay's evaluation that B.S. performs at the second or third grade level on reading fluency, comprehension and written and oral expression.

Contrary to the Parents' argument, the Court finds that the weight of the evidence suggests that B.S. succeeded at Cranbury with certain accommodations and modifications, including in a number of mainstream classes, and would similarly succeed at Princeton – in both mainstream and pullout classes – with similar accommodations and modifications.  For example, one of B.S.'s teachers stated that B.S. did well in a mainstream eighth grade advanced math class with 22-23 students. Transcript Hearing 3, at 102–03; ALJ Decision, at 10.  Indeed, although B.S.

24

received some accommodations and modifications, he performed well in that class without the use of a teaching assistant or in-class special education teacher.  Id.  In addition, the record demonstrates that B.S. similarly succeeded in a mainstream eighth grade science class, where B.S. was provided with a teaching assistant.  Hearing Transcript 3, at 103.

Moreover, although the Parents continue to rely on Dr. Kay's report which indicates that B.S. performs at the second or third grade level in reading fluency, reading comprehension, written expression, and oral expression, and, therefore, that B.S. is not ready to transition to high school, the ALJ found, that "there were just too many deficiencies attached to the report and recommendations by Dr. Kay to give it too much weight under the circumstances." ALJ Decision, at 27.   The Court finds that the ALJ's credibility determination concerning Dr. Kay is supported by the record.  For example, the ALJ noted that there was nothing in the record to substantiate Dr. Kay's conclusion that B.S. should be kept at an immature grade or course level.  ALJ Decision, at 27.  Conversely, the record demonstrates that B.S. had been academically successful at Cranbury in a number of mainstream eighth grade classes, and the IEP reflects B.S.'s growth and development, while also acknowledging his areas of need.  See AR, Defendant's Exhibit 10.  Moreover, contrary to Dr. Kay's findings, B.S.'s teachers, Ms. Lundquist and Ms. Penney, both testified that B.S. thrived on cognitive challenges, which would be provided by mainstream classes at Princeton High School.  Hearing Transcript 5, at 147.

Further, with regard to the Parents' concerns about B.S.'s ability to navigate high school due to his physicality and size, as well as his difficulties in social settings, the ALJ specifically noted that the Parents' fears  "will have been ameliorated by B.S. having been part of a rather tight knit

25

intact student network which had been in place at Cranbury during all of this formative years and which group of students has moved on to Princeton High School . . . His fellow students nurtured him while at Cranbury and they would be a significant asset to B.S. at Princeton. " Id.  In addition, the record indicates that the hallways at PHS were less crowded during transition times than those at Cranbury.  Hearing Transcript 1, 67-70.  Moreover,  the Parents concerns' about B.S.'s physical stature were adequately addressed in the IEP.  First, the IEP notes that by transitioning to PHS, B.S. would be matriculating with his peers. As described by the ALJ, a familiar group of students is essential since they "can continue to be a safety net and a comfort zone to him as they all embrace the high school environment together." ALJ Decision, at 26–27. In addition, the IEP provides for an aide to assist B.S. during transition periods, an area of concern for the Parents. AR, Defendant's Ex 10, at 20.  Thus, the ALJ determined that these provisions should "satisfy any of [the parents] concerns regarding the ability of their child to transition into Princeton." ALJ Decision, at 26; see also AR, Defendant's Exhibit 10, at 20. The Court agrees and finds that the record supports the ALJ's conclusion that placement at PHS was not inappropriate because of B.S.'s physical stature.

Next, the Parents argue that the 2009–2010 IEP was inappropriate since it did not include special instruction individually designed for B.S.   Specifically, the Parents argue that the IEP did not contain specialized instruction relating to "pragmatic and social language skills, reading fluency, comprehension, written expression and social skills," Pls' Br. at 25, that the content of the proposed courses was too difficult, and that the IEP eliminated "meaningful physical therapy and. . . fail[s] to provide any occupational therapy."  Id. at 26-27.   In addition, the Parents argue

that the IEP did not include any of Dr. Kay's recommendations.  Id. at 25-27.  As a result, the Parents argue that the placement at PHS was inappropriate and that they are entitled to tuition reimbursement.  The Court does not agree

Importantly, contrary to Plaintiffs' suggestions, in the underlying matter, the ALJ found that "the proposed IEP sets forth specific goals and objectives and identifies various, personalized accommodations in order to provide for the needs of B.S. . . ." ALJ Decision, at 27.   For example, in an attempt to address B.S.'s unique needs, the IEP provides: (1) a list of goals and objectives for B.S.; (2) classroom modifications such as preferential seating, chunking of material, use of computers, use of spell check on a computer, extra time for assignments, etc.; (3) supplementary aids; (4) mainstream classes in areas where B.S. excels (Geometry I, US History I ICR, Biology I ICR, French II), and pullout classes where B.S. needs improvement (English I, Biology I Lab, US History I Lab); (5) speech-language services related to his replacement English class; (6) adaptive physical education; (7) a Social Skills Group that would meet once a week; (8) Physical Therapy once a month; and (9) a one-to-one aide to assist B.S. during transition periods, to help with his organization skills, and to facilitate social interactions with his peers. AR, Defendant's Exhibit 10.  Therefore, the Court finds that the IEP sufficiently considered B.S.'s individual abilities and provided for his unique needs.  See Ridgewood Bd. of Educ., 172 F.3d at 247.

The Parents also argue that although the IEP team had access to Dr. Kay's report beginning in May 2009, the IEP was not based on peer-reviewed research, and, therefore, was not appropriate. Specifically, the Parents argue that in light of 20 U.S.C.A. § 1414(d) which provides, in relevant

part, that an IEP must include "a statement of the special education and related services and

supplementary aids and services, based on peer-reviewed research to the extent practicable . . ."

20 U.S.C.A. § 1414(d), Dr. Kay's report should have been incorporated in B.S.'s IEP.  The Court

does not agree.

Initially, the Court notes that in Joshua A. v. Rocklin Unified Sch. Dist., 2008 WL 906243

(E.D.Cal.2008), a California District Court stressed that Congress did not require "the greatest

body of research be used in order to provide FAPE."  Id.  The court further stated that, "there is

nothing in the Act to suggest that the failure of a public agency to provide services based on

peer-reviewed research would automatically result in a denial of FAPE." Joshua, 2008 WL

906243 at *3.   Thus, the alleged failure of the IEP to include peer-reviewed research is not

enough, on its own, to warrant a finding that the IEP is not appropriate.

Moreover, in the underlying matter, the ALJ determined the proper weight to give to Dr.

Kay's report.  Specifically, the ALJ concluded that Dr. Kay's report was not reliable for various

reasons including that the testing on B.S. was conducted in a brief, four-hour period and without

any consideration for B.S.'s fatigue factor.  See Hearing Transcript 5, at 46–47.   Moreover, Dr.

Kay's testing provided a one day snapshot of B.S., while B.S.'s teachers and other members of

CST had much more in-depth knowledge of and experience with B.S.  ALJ Decision, at 22.

Further, as discussed above, the IEP, in fact, incorporated a number of the same findings,

modifications and accommodations that were set forth in Dr. Kay's report.  See, e.g., Hearing

Transcript 3, at 102.  For example, Ms. Perry testified that she "took my own copy of Dr. Kay's

report and just took notes next to it as to whether we currently provide or provided during eighth

grade that accommodation or modification, and the consensus was that we provided the majority of them. [But] [t]here were a few recommendations that we did not feel were appropriate for B." Id.   Thus, the Court finds that the alleged failure to include all of Dr. Kay's recommendations did not appear to affect B.S.'s IEP, particularly in its ability to provide a meaningful educational benefit, as the IEP reflected a "comprehensive collaboration between both the sending district and the receiving district as B.S. was positioned to transition out of the eighth grade." ALJ Decision, at 27; see Hearing Transcript 1, at 50, 67 (noting the individuals involved in meeting with the parents to discuss B.S.'s progress and his IEP).

In addition, the Parents argue that because the IEP recommends a one-to-one aide, the IEP is contrary to the IDEA's stated purpose of achieving independence.  However, the record demonstrates that the use of a one-to-one aide may be the most appropriate way to assist B.S. at Princeton High School and to ensure that Defendant provides B.S.  a FAPE in the "least restrictive environment," 20 U.S.C.A. § 1412(a0(5)(A), i.e., "one that, to the greatest extent possible, satisfactorily educates disabled children together with children who are not diabled, in the same school the disabled child would attend if the child were not disabled."  Carlisle Area Sch., 62 F.3d at 535.  Specifically, as discussed above, B.S.'s parents have continuously expressed concern regarding B.S.'s ability to navigate Princeton High School, use a locker, use the bathroom, and change for Physical Education. Hearing Transcript 1, at 64.  In an attempt to address these concerns, Ms. Atzrott proposed an aide for B.S. to help him navigate the building, get to class on time, pack up at the end of class, ensure that his assignments are written down and provide him with in the moment feedback.  Moreover, the record demonstrates that B.S. was

successful with an aide at Cranbury; conversely, nothing in the record indicates that an aide, in

the limited situations provided for, would be stigmatizing to B.S.  Indeed, Ms. Perry testified that

the aide could be phased out as B.S. learns his way around the school and becomes familiar with

his schedule. Transcript Hearing 3, at 105–08.  Thus, the Court finds that the inclusion of an aide

in the IEP does not warrant a finding that it was inappropriate.

In addition, the Parents argue that, based on a 2004 self-assessment, Princeton High School

has numerous "areas of need" regarding its ability to provide a FAPE to B.S.   In the underlying

matter, the ALJ held that the "five-year-old self assessment report which was referenced by the

parent[s] appears to be too remote in time in order to give it any reasonable or relevant

consideration. And, in any case, it is just that- a self assessment at best." ALJ Decision, at 28.  As

a result, the ALJ gave little weight to the self-assessment in determining that the IEP was

appropriate.  The Court does not find error in that determination.  However, even accepting that

this report is germane to B.S.'s case, the Court finds that the 2004 report indicates the Princeton

High School is compliant in all relevant standards: (1) FAPE; (2) Procedural Safeguards; (3)

Location, Referral and Identification; (4) Protection in Evaluation and Evaluation Procedures; (5)

Reevaluation; (6) Eligibility; (7) Individualized Education Program; (8) Least Restrictive

Environment; (9) Transition to Post-School; (10) Transition to Preschool; (11) Discipline; (12)

Programs and Services; and (13) Student Records. AR, Plaintiffs' Exhibit 18, at 3-6.  In fact, the

New Jersey Department of Education Special Education Monitoring noted: "The Princeton

Regional School District is commended for the exceptionally comprehensive review conducted

during the self-assessment process. As a result of that review the district was able to identify all

areas of need and develop an improvement plan." Id.  The Department also commended the High School "for the many areas determined by the district as compliant with federal and state statues [sic] and regulations and verified by the Office of Special Education Programs." Id. at 7. Thus, the Court finds that nothing in the record supports the Parents' suggestion that PHS is unable to deliver the services set forth in the IEP.

Finally, the Parents argue that the January IEP was inappropriate since it failed to provide B.S. with an ESY for the summer of 2009.  The Court does not agree.  Indeed, in the underlying opinion, the ALJ noted that while the initial January 2009 IEP did not contain an ESY placement, Cranbury amended the IEP to reflect the provision of an ESY for B.S. ALJ Decision, at 20. Indeed, on March 30, 2009, in response to a letter from Ms. Atzrott that included the amended IEP, Mr. G.S. wrote to Ms. Atzrott, "Thank you for revising Ben's IEP . . . to provide for a summer program." Def's Exhibit 6.

Moreover, to the extent that the Parents argue that Defendant used the ESY issue as leverage to force the Parents to place B.S. at PHS, the Court finds this argument to be disingenuous.   The record makes plan that in drafting B.S.'s IEP, Cranbury determined to wait until it had finalized a placement for B.S. for the 2009-2010 school year to ensure that the ESY for Summer 2009 would be the same.  Indeed, as discussed above, although B.S. had been placed at the Lewis School during the summer of 2008, Ms. Atzrott and Ms. Perry noted the difficulty that B.S. had in transitioning back to Cranbury following the summer at the Lewis School.  Thus, to allow for an easier transition for B.S., the IEP team determined to place B.S. in the same program for the ESY as he would begin in the Fall of 2009.  However, because of the Parents' ongoing concerns

31

about PHS and their continued requests for an out-of -district placement, Cranbury could not

determine an ESY for B.S.  Pls' Exhibit 11.  Indeed, in an email to the parents dated April 2,

2009, Ms. Atzrott explained that the CST was continuing "to investigate other out-of district

placement options for [B]" but that, "[a]s soon as the decision is made regarding his placement

for September, we will finalize his ESY program."  Pls' Exhibit 11.  Thus, this Court concurs

with the ALJ that the April 2 email was not a "hammer," but was instead, "an update, and a

positive one at that, regarding the status of the Cranbury search efforts for an appropriate

placement as well as their willingness to continue working with the parents toward resolution."

ALJ Decision, at 24.  Because the Parents never agreed to the CST's placement and unilaterally

placed B.S. at the Lewis School, an ESY could not have been provided by Cranbury.

For all the reasons discussed above, the Court finds that the record demonstrates that B.S.'s

IEP was reasonably calculated to provide B.S. with a meaningful educational benefit at Princeton

High School, and, therefore, the Court  upholds the ALJ's decision in its entirety.

### 3. The Parents Are Not Entitled to Reimbursement for the Unilateral Placement of B.S.at the Lewis School

It is well-established that "a court may award a disabled student the cost of his private

placement if (1) the court determines the student's IEP is inappropriate and (2) the student

demonstrates that the private placement he seeks is proper." Lauren W. v. Deflamino, 480 F.3d

259, 276 (3d Cir. 2007)(quoting Ridgewood Bd. of Educ., 172 F.3d at 247)(emphasis added)[5].

---

[5] The Court notes that part of the inquiry into reimbursement includes a a demonstration by the
parents that they have acted in good faith.  Lascari, 116 N.J. 30, 50; see also 20 U.S.C.
§1412(a)(10)(C)(ii).  As discussed above, in the instant matter, the ALJ determined that the
Parents did not demonstrate good faith in their dealings with Cranbury.  Indeed, the ALJ noted
that prior to their IEP meeting with Cranbury, and, more importantly, unbeknownst to Cranbury,
the Parents had signed a contract to place B.S. at the Lewis School during the summer of 2009

However, parents who, like B.S.'s, "unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials, do so at their own financial risk."  School Committee of Town of Burlington, Mass. v. Department of Educ. of Mass., 471 U.S. 359, 373-374 (1985).  Because this Court has found that the IEP was appropriate and  reasonably calculated to provide B.S. with a meaningful educational benefit, the Court need not consider the appropriateness of the Parents' unilateral placement at the Lewis School.   As a result, the Court finds that the Parents are not entitled to reimbursement.

## IV. CONCLUSION

For the reasons set forth above, the Court will affirm the ALJ's decision. Thus, the Parents' Motion for Summary Judgment is DENIED, and Cranbury's Motion for Summary Judgment is GRANTED.

---

and the 2009-2010 school year.  Hearing Transcript 5, at 142, 164.  Specifically, the ALJ explained that," the glaring admission by [Mr.] G.S. relative to the family entering into a contract with the Lewis School in January 2009, (which was only gleaned at the very end of cross-examination) strongly supports the conclusion that the family had already made up its mind about its placement preference and determination by that time even though they had lulled the Cranbury child study team into believing that they were still willing to work together in good faith in attempting to provide the appropriate program and placement for B.S. . . Thus, I find that the parents did not act in good faith in attempting to work with the district, and this continue even through mediation and the virtual surprise filing for due process by them thereafter." ALJ Decision, at 23.   Indeed, the Court notes that if the Parents were acting in good faith, they would have, at the least, informed Cranbury of their contract with the Lewis School at the January IEP meeting.  However, in light of the finding that the IEP was appropriate under the IDEA, the Court need not reach the inquiry into good faith.

DATED:  April 26, 2011                          /s/ Freda L. Wolfson

                                                Freda L. Wolfson U.S.D.J.